IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA
PHOENIX DIVISION

Gabriel Sheridan Sharp,

Plaintiff,

-vs-

John Gay, et al.,

Defendants.

Case No. 2:11 CV 925 - ROS

MEMORANDUM OPINION AND ORDER

JUDGE JACK ZOUHARY

## INTRODUCTION

Plaintiff Gabriel Sheridan Sharp ("Sharp"), a Mojave Indian and an inmate at the Central Arizona Correctional Facility ("CACF"), brings suit against Charles Ryan, Director of the Arizona Department of Corrections ("ADOC"); CACF Warden John Gay ("Gay"); and Mike Linderman ("Linderman"), ADOC Senior Chaplain. Sharp alleges Ryan, Linderman, and Gay deprived him of his equal protection rights, and that Ryan and Linderman violated the Religious Land Use and Institutionalized Persons Act ("RLUIPA").

In February 2014, after a January three-day bench trial, counsel for the parties stipulated to dismiss with prejudice most of Sharp's original claims (Doc. 130). Two claims remain. Invoking 42 U.S.C. § 1983, Sharp claims all Defendants deny him equal protection by refusing to allow Native American inmates an additional weekly "turnout," the prison's term for a scheduled inmate religious activity. Sharp also claims that ADOC policy regarding inmate access to firewood, the fuel for Native American sweat ceremonies, violates RLUIPA. The parties filed Proposed Findings of Fact and Conclusions of Law with respect to these two claims (Docs. 140–42). This Court then allowed the parties time to explore resolution of the remaining claims; however, settlement talks did not succeed.

## BACKGROUND

**ADOC's Turnout Policy**

CACF refers to scheduled inmate religious activities as "turnouts." Each week, facility chaplains prepare turnout schedules, informing CACF's roughly 1,100 inmates when they may participate in religious observance of a particular type (Doc. 135 at 5; Doc. 141-1 at 1 (turnout schedule for the week of November 18, 2012); Exhs. 14_001, 14_002, 14_004). *See also* Exh. 14_003 (weekend turnout schedule). The turnout schedules in use in March 2014 were substantially the same as schedules used in 2011 (Doc. 135 at 9).

Consistent with ADOC policy, CACF generally approves a turnout only if the turnout is supervised by chaplain staff or an outside volunteer (*id*. at 18). Prior to 2002, ADOC contracted with outside religious officiants to assist with inmate religious practice, but that arrangement was discontinued due to state budget constraints (Doc. 143 at 12). CACF Chaplain Sylvester Ajagbe ("Ajagbe"), who works weekdays from 7:00 a.m. to 3:00 p.m. and volunteers on occasional weekends (Doc. 135 at 6–7), supervises a majority of the services held during his normal work hours (*id*. at 6). But even when Ajagbe or outside religious volunteers are present, security staff also observes the inmates to maintain order (*id*.).

Volunteer availability varies across the faith traditions observed by inmates. For example, roughly 80 percent of CACF inmates observe some form of Christian worship (*e.g.*, a Protestant denomination and Catholicism) (*id*. at 13). Religious volunteers are more readily available for ceremonies attended by Christian-affiliated inmates. By contrast, CACF has difficulty securing volunteers for religious traditions observed by only a minority of the inmate population (*e.g.*, Islam, Judaism, and adherents of Native American religious practices) (Doc. 143 at 52).

If, for a given week, neither the chaplain nor an outside religious volunteer is available to supervise, for example, an Asatru turnout, inmates who follow that faith may instead attend a multi-faith gathering overseen by Ajagbe (Doc. 135 at 18–19; Doc. 143 at 38). At that multi-faith gathering, each religious group may engage in its faith's religious activities -- Native American inmates, for example, may hold talking circles or engage in group smudging (Doc. 143 at 38, 40–41). Inmates have the option of holding the talking circles indoors during the multi-faith gatherings, or may select an outdoor visitation area where they may generate smoke as part of group smudging (*id*. at 41).

Aside from identifying the type of religious activity and the time allotted for that activity, the weekly turnout calendars note the presence of volunteers for that activity in several ways: first, a calendar entry may contain a notation of "volunteers," indicating outside religious volunteers will be available to supervise the turnout (*see, e.g.*, Exh. 14_002 (reflecting a volunteer would be present for the August 18, 2013 "Prayer Service Prep")); second, a calendar entry may contain a notation of "w/o volunteers," indicating no volunteer will be present (*see, e.g*, Exh. 14_002 (noting the August 21, 2013 "LDS Vocal Team" turnout would be held "w/o Volunteer")); and third, the majority of calendar entries reflect no notation as to the presence of volunteers (*see, e.g.*, Exh. 14_004 (omitting any notation with respect to volunteer presence for the October 23, 2013 "LDS Vocal Team" event)). For ease of reference, this Court refers to this third category of turnouts as "unlabeled turnouts."

The parties dispute whether volunteers are present during unlabeled turnouts. Sharp claims he spoke with other inmates who participated in unlabeled turnouts, learning that "half the time they do have a volunteer [for unlabeled turnouts] and half the time they don't" (Doc. 134 at 78). Sharp's second-hand, non-specific explanation of the unlabeled events is not persuasive, and portions of his testimony on this point are inadmissible hearsay in any event. Ajabge, who weekly compiles the

turnout schedule, explained that the turnout schedule, as a general rule, includes only events for which there is an approved supervisor (*e.g.*, the chaplain or a volunteer). "W/O volunteers" appears in a calendar entry not because some particular group is allowed preferential treatment, but rather because of unforeseen changes in volunteer availability (*see* Doc. 135 at 19) (Ajagbe explaining that past turnouts were held without volunteers because of an unexpected unavailability or death of a religious volunteer). "It is not [Ajagbe's] plan to [hold services without volunteers] because [he] ha[s] to follow the policy of DOC" (*id*. at 18). *See also* Doc. 137 at 21.

Thus, each week, the following opportunities are available for Native Americans to practice their faith in a group setting: (1) when firewood is available, six hours each Saturday to hold a sweat lodge ceremony, during which time inmates are effectively "unsupervised"; to avoid desecrating the lodge, no security staff enters the sweat lodge (Doc. 135 at 20; Doc. 137 at 8); (2) in addition to a sweat ceremony, another turnout if supervised by an outside volunteer or chaplain (Doc. 139-1 at 6); (3) if firewood and a supervisor are unavailable, fifty-five minutes during the multi-faith gathering to engage in group religious practice (*e.g.*, talking circles and group smudging) (*id*.; Doc. 143 at 39). Native Americans also hold more religious festivals than other faiths (Doc. 135 at 20). Native Americans are allowed a "religious box," which holds their personal religious supplies, and may pray or smudge on their own (Doc. 134 at 86, 124). Finally, all inmates may attend miscellaneous religious-related events throughout the year, like Ajagbe's "Food for Thought" discussion sessions or periodic choir sessions (Doc. 135 at 14).

Sharp seeks injunctive relief, directing all Defendants to grant Native American inmates an additional weekly turnout. He seeks "additional time to teach the Native Americans the music they need to know and more time to teach the reasons for our religion" (Doc. 134 at 83). He objects to

being relegated, in the absence of firewood and an outside volunteer, to group religious observance held during the multi-faith gathering. Sharp explains that with so many different faith traditions engaging in group worship at the same time and place, there are "different energies" preventing Native American inmates from purifying their worship space (*id.*).

**ADOC's Firewood Policy**

Except for those housed in the ADOC's maximum security units, ADOC's Native American inmates have access to outdoor sweat lodges (Doc. 137 at 35). A sweat lodge is a dome structure, created with bent willow poles (Doc. 134 at 8), and covered with blankets and a tarp when in use (*id.* at 11, 13). Native American inmates consider the sweat lodge and surrounding grounds to be sacred areas (*id.* at 9).

When wood is available, Native American inmates may hold sweat ceremonies each Saturday, which are calendared from 6:00 a.m. to noon (*see, e.g.*, Exh. 14_001). On the morning of a sweat, firestarters -- select Native American inmates (including Sharp) -- enter the sweat lodge grounds to prepare for the sweat ceremony (Doc. 134 at 10–11). Firestarters use wood to start a fire in a firepit adjacent to the sweat lodge (*id.* at 12). Firestarters place "grandfathers," large sacred stones, in the firepit, and heat the stones to high temperatures (*id.*).

Inmates file into the sweat lodge for the ceremony (*id.* at 14) and, using metal shovels, transfer the heated grandfathers from the firepit to the door of the sweat lodge. At the door of the sweat lodge, an inmate uses wooden sticks to carry the grandfathers from the shovel to an altar at the center of the sweat lodge (*id.* at 18–19). The grandfathers heat the sweat lodge, and from time to time are used to generate steam by inmates who pour water over top of the grandfathers. Sweat ceremonies are an important component of Native American inmate's religious practice, and are not possible without some source of firewood.

CACF inmates previously obtained sweat ceremony wood from pallets accumulated at CACF in the normal course of its operations. Sometime in 2010, CACF barred further use of pallet firewood (*id*. at 64). Prison officials note pallets are held together with nails, which prison officials worry could be retrieved from firepit ashes and used to fashion weapons. Some pallets are constructed of lumber treated with chemicals which may produce harmful fumes when burned. Finally, unlike in the past, there is now a resale market for CACF pallets (Doc. 143 at 50–51). CACF inmates may now only obtain wood for sweat ceremonies by in-kind donations from family or friends outside the prison (*id*. at 46).

ADOC will not purchase firewood for inmates -- indeed, ADOC does not use facility funds to purchase materials dedicated to inmate religious use (*id*. at 69). Nor does ADOC permit inmates to purchase firewood, either individually or as a group. ADOC bars individual inmate firewood purchases out of a concern that inmates who purchase firewood would use their largesse as a way to coerce, or obtain leverage over, other inmates who participate in (but do not pay for) sweat ceremonies (Doc. 137 at 32). ADOC bars group inmate firewood purchases, in part because of leverage-based security concerns, but also because such purchases would require ADOC to create and administer group accounts for religious purchases (*id*.). Sharp participates in sweats with Native Americans who live in his medium-security housing unit. ADOC claims if it permitted group accounts, inmates in each housing unit would ask that their purchases of firewood be reserved for that unit's sweat lodge (*id*. at 38, 39). As a result, each housing unit at each Arizona public or private prison would require a group account for purchasing firewood. Further, if ADOC policy is to be neutral with respect to treatment of different religious groups, ADOC would have to create group accounts for use by inmates who follow other faith traditions -- again, for each housing unit at each public and private prison facility (*id*. at 36–37, 39; Doc. 142 at 7).

ADOC also explained which staff would be tasked with administering group religious accounts. ADOC prohibits staff chaplains from handling prison funds. As a result, group accounts would have to be administered (like an inmate's individual account) by non-chaplain prison staff (Doc. 143 at 46). ADOC claims existing staff levels could not effectively manage group religious accounts (Doc. 137 at 37). Relatedly, ADOC claims it would incur additional expenses -- in the form of training and supervision activities -- so that ADOC employees tasked with directly administering such accounts do not violate state law. ADOC once permitted group recreational accounts, but discontinued that policy after prison staff were caught embezzling funds (*id*. at 34, 38). Permitting group inmate firewood purchases could potentially require more than 2,200 group religious accounts -- one such account for each of Arizona's 57 prison housing units for each of the 40 or so ADOC-recognized faiths (Doc. 142 at 7).

In 2013, and under ADOC's in-kind firewood donation policy, Sharp and the inmates who sweat with him were able to hold only five sweats (Doc. 134 at 55). When pallet wood was available, Sharp's housing unit was able to hold weekly sweats (*id*. at 59). Sharp explained that outreach to Native American tribes or to inmate family and friends, soliciting in-kind firewood donations, were largely unsuccessful (*id*. at 56–57). Inmates obtained only two firewood donations in 2013 (*id*. at 58–59).

Sharp asks this Court to order ADOC to establish group religious accounts, fed by inmate and outside donations, which could be used to purchase firewood for sweat ceremonies (Doc. 134 at 61).

## DISCUSSION

### Equal Protection Claim

"The Supreme Court has repeatedly held that prisoners retain the protections of the First Amendment. A prisoner's right to freely exercise his religion, however, is limited by institutional

objectives and by the loss of freedom concomitant with incarceration." *Hartmann v. Cal. Dep't of Corr. & Rehab.*, 707 F.3d 1114, 1122 (9th Cir. 2013) (internal citations omitted). Specifically, the Equal Protection Clause and the Free Exercise Clause do not guarantee inmates of different faith traditions "identical facilities or personnel" for use in their religious observances; what the Clauses guarantee an inmate is "a reasonable opportunity of pursuing [the inmate's] faith comparable to the opportunity afforded fellow prisoners." *Cruz v. Beto*, 405 U.S. 319, 322 & n.2 (1972). Because there is no evidence that ADOC turnout policy was designed or implemented with discriminatory or other invidious intent, the turnout policy does not violate the Equal Protection Clause if, though the "prison regulation impinges on inmates' constitutional rights," it is "reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987). The four *Turner* factors govern that inquiry:

(1) Whether there is a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it;

(2) Whether there are alternative means of exercising the right that remain open to prison inmates;

(3) Whether accommodation of the asserted constitutional right will impact guards and other inmates, and on the allocation of prison resources generally; and

(4) Whether there is an absence of ready alternatives versus the existence of obvious, easy alternatives.

*Shakur v. Schriro*, 514 F.3d 878, 884 (9th Cir. 2008) (ellipsis and internal quotation marks omitted). This Court must apply the *Turner* factors with "due regard for the inordinately difficult undertaking that is modern prison administration, recognizing that certain proposed interactions, though seemingly innocuous to laymen, have potentially significant implications for the order and security of the prison." *Hrdlicka v. Reniff*, 631 F.3d 1044, 1050 (9th Cir. 2011) (internal quotation marks omitted).

First, budgetary constraints and institutional security concerns are legitimate government

interests. ADOC's turnout policy is reasonably related to these legitimate interests. ADOC discontinued contract religious supervision services because of budgetary constraints. It has declined to allow Native American inmates an additional turnout, because each turnout must be monitored by security staff. Limiting each faith tradition to a weekly turnout -- either on a standalone basis, or as part of the multi-faith gathering when an outside volunteer or chaplain cannot monitor a standalone turnout -- advances the goal of conserving security personnel resources.

To the extent Sharp argues CACF's Christian inmates receive preferential treatment in the number of turnouts each may attend, he fails to demonstrate disparate accommodations or other invidious intent. CACF houses inmates who adhere to many different Christian denominations and who practice their Christian faith in different languages (*e.g.*, English or Spanish) (Exh. 14_004). CACF also houses far more Christian inmates than inmates who adhere to other faith traditions. And, for reasons unrelated to CACF policy, religious volunteers are more readily available for Christian turnouts. Thus, it is an oversimplification to count each Christian turnout, compare that sum to the turnouts allowed Native American inmates, and conclude CACF treats Native Americans disparately, and for reasons unconnected to legitimate penal interests.

Second, Sharp has access to other ways of practicing his faith, beyond the additional turnout that he seeks. "The relevant inquiry under this factor is not whether the inmate has an alternative means of engaging in the particular religious practice that he or she claims is being affected; rather, [this Court must] determine whether the inmates have been denied all means of religious expression." *Ward v. Walsh*, 1 F.3d 873, 877 (9th Cir. 1993). Here, Sharp can: participate in sweat ceremonies when donated wood is available; participate in group talking circles and smudging, either under the supervision of a Native American religious volunteer when available, or during the weekly multi-faith gathering when no religious volunteer is available; attend Native American religious festivals; join

in general chaplaincy programs; and engage in individual religious worship, like personal smudging and prayer.

Third, Sharp's requested relief -- to allow Native American inmates an additional turnout -- "will impact guards and other inmates, and on the allocation of prison resources generally." An additional turnout would affect allocation of security and chaplain staff resources. Moreover, non-Native American inmates who also face difficulty in securing outside volunteers likely would ask for an additional turnout.

Finally, Sharp points to no obvious and easy alternative for extending Native American inmates an additional turnout on a neutral basis. The final *Turner* factor is not a least-restrictive-means inquiry. *Turner*, 482 U.S. at 90–91. *See also Bahrampour v. Lampert*, 356 F.3d 969, 976 (9th Cir. 2004) ("If there are no obvious alternatives, and if the inmate only presents solutions that will negatively impact valid penological interests, then courts will view the absence of ready alternatives as evidence of a reasonable regulation."). Sharp simply asks that he and Native American inmates be granted an additional turnout, which will require additional security or chaplain staff time to monitor. That additional security staff commitment "negatively impact[s a] valid penological interest[]."

Based on a review of the evidence, this Court concludes each *Turner* factor weighs in favor of a finding that CACF's existing turnout policy is constitutionally permissible. Sharp has not shown "the regulation[ is] irrational or unreasonable, or that there are alternative solutions that are easy, obvious, and of *de minimis* cost to valid penological interests." *Id.* at 976 (internal quotation marks omitted). This Court finds in favor of all Defendants with respect to Sharp's Equal Protection Clause claim.

**RLUIPA Claim**

RLUIPA provides that "[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution," including a qualifying prison, "unless the government demonstrates that imposition of the burden on that person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc-1. The Act should be "construed in favor of a broad protection of religious exercise, to the maximum extent permitted by the terms of this chapter and the Constitution." 42 U.S.C. § 2000cc-3(g).

Sharp must first establish a prima facie case that ADOC's firewood policy substantially burdens his religious exercise. The burden of persuasion then shifts to Defendants to show any substantial burden on Sharp's religious exercise is "*both* in furtherance of a compelling governmental interest *and* the least restrictive means of furthering that compelling governmental interest." *Warsoldier v. Woodford*, 418 F.3d 989, 995 (9th Cir. 2005) (emphases in original) (internal quotation marks omitted). *See also May v. Baldwin*, 109 F.3d 557, 564–65 (9th Cir. 1997) (noting in the context of a Religious Freedom Restoration Act case "[w]here a prisoner challenges [prison officials'] justifications, prison officials must set forth detailed evidence, tailored to the situation before the court, that identifies the failings in the alternatives advanced by the prisoner."). RLUIPA's least-restrictive-means standard is "the most demanding test known to constitutional law." *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997). Still, Congress envisioned "Courts would apply [RLUIPA's] standard with due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security[,] and discipline, consistent with consideration of costs and limited resources." *Cutter v. Wilkinson*, 544 U.S. 709, 723

(2005) (internal quotation marks omitted). RLUIPA's standard is more demanding than the *Turner* standard. *Alvarez v. Hill*, 518 F.3d 1152, 1156–57 (9th Cir. 2008).

RLUIPA's expansive definition of "religious exercise" "bars inquiry into whether a particular belief or practice is 'central' to a prisoner's religion." *Greene v. Solano County Jail*, 513 F.3d 982, 987 (9th Cir. 2008) (quoting *Cutter*, 544 U.S. at 725 n.13). Sharp testified in great detail on the religious significance of the sweat ceremony to observant Native Americans, a point Ryan and Linderman do not challenge in their Proposed Findings of Fact and Conclusions of Law. The sweat ceremony is therefore a "religious exercise" within the meaning of the Act.

Further, Sharp has shown ADOC policy limiting sources of firewood constitutes a "substantial burden" on that religious exercise. In this Circuit, prison policy substantially burdens an inmate's religious exercise if it "impose[s] a significantly great restriction or onus on such exercise." *Hartmann* 707 F.3d at 1125. Other circuits employ similar rules for identifying regulations that substantially burden religious exercise. *See, e.g.*, *Patel v. U. S. Bureau of Prisons*, 515 F.3d 807, 813 (8th Cir. 2008) (explaining a prison regulation "must significantly inhibit or constrain conduct or expression that manifests some central tenet of a person's individual religious beliefs [or] meaningfully curtail a person's ability to express adherence to his or her faith or [] deny a person reasonable opportunities to engage in those activities that are fundamental to a person's religion"); *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1227 (11th Cir. 2004) (noting that a substantial burden surely exists if "a regulation completely prevents the individual from engaging in religiously mandated activity, or if the regulation requires participation in an activity prohibited by religion"); *Civil Liberties for Union Believers v. City of Chicago*, 342 F.3d 752, 761 (7th Cir. 2003) ("[A] substantial burden on religious exercise is one that necessarily bears direct, primary, and fundamental responsibility for rendering religious exercise . . . effectively impracticable."). The

evidence establishes that ADOC's firewood policy significantly restricts inmates' ability to engage in sweat ceremonies. Indeed, the policy effectively prevents inmates from holding sweat ceremonies. And again, Ryan and Linderman do not meaningfully argue in their Proposed Findings of Fact and Conclusions of Law that the firewood policy does not impose a significant restraint on Sharp's religious practice.

Because Sharp has made a prima facie showing that ADOC's firewood policy violates RLUIPA, Ryan and Linderman must show the firewood policy was adopted as the least-restrictive means of advancing a compelling government interest. They have failed to carry that burden.

"[M]aintaining good order, security and discipline, consistent with consideration of costs and limited resources, is a compelling government interest." *Shakur*, 514 F.3d at 889 (internal quotation marks omitted). But the in-kind firewood policy must further that compelling interest in some way. There is no specific evidence, aside from conclusory assertions by prison officials, that the in-kind firewood policy serves a security or cost-saving interest that would not similarly be served by group religious accounts.

To recap, ADOC justifies the in-kind firewood policy by reference to security concerns centering on the potential that individual inmates who can better afford to contribute to a housing unit's firewood purchases would exercise leverage over other inmates. However, Native American inmates already use individual funds to purchase materials used for group religious practice, including smudging materials and the sacred gourd (Doc. 137 at 58), and herbs used to bless the sweat lodge grounds (Doc. 134 at 14). There is no evidence that this existing potential for inmate-to-inmate coercion generates security threats. Moreover, because the in-kind firewood policy allows an inmate's family to donate firewood for use in the inmate's housing unit's sweat ceremonies, the in-kind firewood policy already permits inmates to gain leverage over other inmates. Under current

policy, an inmate who has (relatively) wealthy family members could secure family firewood donations, while an inmate from a (relatively) poor family would be unable to secure family firewood donations. Again, the record lacks any indication that inmates have manipulated the in-kind firewood policy in this way.

ADOC's cost-based concerns are similarly unsupported by record evidence. ADOC estimated the approximate maximum number of group religious accounts that may have to be established if Sharp secures the relief he seeks. But ADOC provides no estimate whatsoever of the actual manpower or monetary costs associated with establishing and maintaining group religious accounts; Ryan and Linderman's $1 million dollar cost-estimate, included in the Joint Proposed Pretrial Order (Doc. 75 at 12), is unsupported by any documentary or testimony evidence. *See Shakur*, 514 F.3d at 887 (remanding for further factual development on *Turner* and RLUIPA challenges to prison dietary restrictions because, as to the sole government interest served by the restrictions, "[t]here [wa]s no evidence [beyond conclusory total cost estimates] in the record suggesting that ADOC actually looked into providing kosher meat to all Muslim prisoners, which could potentially result in economies of scale that would reduce the overall cost of the meals"). Moreover, ADOC counts in its (unquantified) tally of group-religious-account costs, funding for training and supervision of staff specifically directed at ensuring ADOC staff do not again embezzle inmate funds from group inmate accounts. Call these costs "compliance costs." To the extent ADOC casts these compliance costs as an amount in addition to that which would be required for normal accounting staff labor costs, this aspect of ADOC's cost concerns deserves little weight. RLUIPA cannot be read to justify substantial burdens on inmate religious exercise simply because adoption of reasonable religious accommodations may require that prison administrators ensure their subordinates do not victimize inmates or outside

donors. RLUIPA itself recognizes the Act "may require a government to incur expenses in its own operations to avoid imposing a substantial burden on religious exercise." 42 U.S.C. § 2000cc-3(C).

Even if Ryan and Linderman had shown the in-kind firewood policy advanced a compelling government interest (which they have not), they have failed to show the in-kind firewood policy is the least-restrictive means for furthering a compelling government interests. ADOC "cannot meet its burden to prove least restrictive means unless it demonstrates that it has actually considered and rejected the efficacy of less restrictive measures before adopting the challenged practice." *Warsoldier*, 418 F.3d at 999.

Only two witnesses offered comment of any kind on ADOC's consideration of alternatives to the in-kind firewood policy. Carson McWilliams, ADOC's Northern Regions Operations Director (Doc. 137 at 4), testified he had no knowledge of any other prison system's policies with respect to the provision of sweat lodge firewood (*id*. at 60–62), and otherwise did not discuss alternatives to the in-kind firewood policy.

Linderman provided more specific testimony as to alternative means for securing firewood. At the outset, this Court notes problems in the basis for Linderman's testimony. Specifically, Linderman testified he does not develop policy with respect to group inmate accounts (Doc. 143 at 45, 48) or play any significant role in setting prison security policy (*id*. at 12–13). Nor is he aware of any other state's firewood policies, except for a Colorado policy "about banking accounts [which] doesn't specifically address fire wood" (*id*. at 69). In short, Linderman testified that if an ADOC official decided to explore possible alternatives to the in-kind firewood policy, it would not be him.

His claim that ADOC considered alternatives to the in-kind firewood policy "[q]uite extensively over the years, trying lots of different angles to see if there was something that might be able to work for everyone involved" is unsupported by specific documentary or testimonial evidence

(*id*. at 45). Much of Linderman's testimony explains why firewood is hard to come by in Arizona. For example, he explained why ADOC discontinued use of pallet firewood (*id.* at 50–51). He also testified that wood availability is limited in the arid regions near CACF (*id*. at 47). Finally, he explained likely shortfalls in relying on prison fire crews to gather wood. Brush abatement no longer occurs at some ADOC facilities because there no longer is brush to abate at or near those facilities. At other facilities where fire crews are still active -- primarily in northern Arizona -- gathered firewood is used in the facilities near where the firewood is gathered (*id*.). Thus, Linderman explained the challenges ADOC faces in finding firewood -- facts that are certainly relevant in a least-restrictive-means analysis -- but (with only two exceptions) does not further discuss solutions that have been explored to meet these challenges, aside from the in-kind firewood policy.

Those two exceptions came in response to defense counsel's questioning, positing alternative firewood policies. Linderman explained ADOC would refuse a matching-funds arrangement to help inmates purchase firewood because (1) ADOC policy prohibits the use of its funds to purchase religious material (*id*. at 69), and (2) a matching funds arrangement would have to be extended to inmates of all religious traditions (*id*. at 48). He also commented that, in the past, ADOC permitted inmates to go "outside the wire" to collect firewood, but that heightened security concerns have largely ended that practice, which requires ADOC chaperones and coordination with local law enforcement authorities in the areas outside of an ADOC facility in which an inmate would gather wood (*id*. at 48–50).

This limited testimony, offered by a witness who has no role in formulating policy with respect to group accounts, ignores the many alterative firewood policies in place at other state and federal prison facilities. The Ninth Circuit has found "comparisons between institutions analytically useful when considering whether the government is employing the least restrictive means. Indeed, the

failure of a defendant to explain why another institution with the same compelling interests was able to accommodate the same religious practices may constitute a failure to establish that the defendant was using the least restrictive means." *Warsoldier*, 418 F.3d at 1000. *See also Shakur*, 514 F.3d at 890 (comparing a challenged dietary restriction to dietary exemptions allowed in another state).

Sharp offered evidence that at least four western states[1] and the federal Bureau of Prisons ("BOP") have adopted firewood policies that (in varying ways) permit inmates to purchase firewood.

Colorado employs "Religious Trust Fund Accounts." The Colorado accounts are fed by "[m]onies donated by offenders or outside sources" and are "held in trust for each [Colorado Department of Corrections ("CDOC")] facility" (Exh. 10_001). CDOC staff manage the accounts (Exh. 10_002 – _003), but CDOC does not itself match inmate or outside contributions.

South Dakota uses "sweat lodge account[s] to receive and distribute funds to be utilized for the maintenance and operation of any approved sweat lodge," including the purchase of firewood (Exh. 11_001). Inmates and outside donors may contribute to South Dakota's sweat lodge accounts (Exh. 11_002).

New Mexico state law requires "a state corrections facility [to] permit [Native American inmates] access on a regular basis, for at least six consecutive hours, to . . . items and materials used in religious ceremonies provided by the inmate or a spiritual advisor" and to a sweat lodge. N.M.

---

1 Sharp submitted a document related to a fifth western state, Nebraska, titled "Manual of Native American Religious Practices in Secure Confinement" (Exh. 09_001 – _044). The Manual notes among the tools and equipment required for weekly sweat ceremonies "approximately one cord of firewood provided per month (natural wood is preferable, however, unpainted/untreated lumber and pallets are acceptable)" (Exh. 09_019). However, it is not apparent from the Manual, or from any other evidence in the record, that Nebraska policy requires that amount of firewood be made available. The Manual appears to only set forth recommendations for accommodating Native American religious practices (*see* Exh. 09_009 (setting forth Manual's purpose); Exh. 09_014 (explaining the Manual describes various Native American religious traditions "with recommended correctional policy and procedures" for accommodating such practices in a prison setting)).

STAT. §§ 33-10-4(B)–(C). Firewood is an "allowable religious item," and the amount offered to inmates is "contingent to (sic) facility space, security" (Exh. 12_008). "The Native American Spiritual Advisor or institution's chaplain, the institution's Deputy Warden for Programs (where appropriate) and the Inmate Spiritual Leaders . . . coordinate efforts to assure that an adequate supply of lava rocks, kindling[,] and chopped wood is at all times on hand" for use in sweat ceremonies. *Native American Counseling Act Policy CD-101100*, NEW MEXICO CORRECTIONS DEP'T, at 7, *available at*, http://www.corrections.state.nm.us/policies/docs/CD-101100.pdf (last accessed July 18, 2014).[2]

In Idaho, inmates are guaranteed (with security exceptions) "a total of 12 cords of firewood per year at each facility with a sweat lodge" (Exh. 13_011). The firewood is either gathered on Idaho prison facility grounds, donated from "individuals, organizations, or businesses," or purchased (Exhs. 13_011 & _012). For firewood purchases, Idaho initially provides $300 per year for each facility with a sweat lodge, and then "will match (dollar for dollar) money donated to a fund dedicated for the purchase of firewood at each facility with a sweat lodge," but only in an amount sufficient to purchase six cords of firewood for each facility with a sweat lodge (Exh. 13_012). Inmates who "have not used coercion or committed other [specific] IDOC rule violations" and who are "active particip[ants]" in sweat lodge ceremonies may donate to the firewood fund (Exh. 13_012 – _013). "[P]rivate

---

2 No party offered Policy CD-101100 into evidence. However, the policy is referred to in one exhibit (*see* Exh. 12_004). Further, this Court may take judicial notice of Policy CD-101100, either as a legislative fact, or as an adjudicative fact that is "not subject to reasonable dispute because [the Policy's content] . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned," namely, the New Mexico Correction Department's website. Federal Evidence Rule 201(b). *See also Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010) (taking "into consideration the list of approved . . . vendors [of annuity contracts and other investments] displayed publicly on the web sites of the South Kitsap and El Dorado School Districts" under Federal Evidence Rule 201(b)).

individuals, organizations, or agencies" also may contribute to the firewood fund (Exh. 13_012).

Finally, the federal BOP likewise provides "approximately one cord of firewood . . . per month" for each sweat lodge so that "[a]t least one [sweat ceremony may be held] per week, . . . . in addition to or substitution of" a talking circle (Exh. 9_019). *See also* Exh. 8_027.

"Surely these other state and federal prison systems have the same compelling interest in maintaining prison security [and] ensuring public safety" by limiting the potential for inmates to use contributions to group religious accounts to gain leverage over other inmates (assuming the in-kind firewood policy even serves that interest). *See Warsoldier*, 418 F.3d at 1000. On its own accord, ADOC is not bound to adopt the firewood policies of the BOP, Colorado, New Mexico, South Dakota, or Idaho. But it must at least show it considered alternatives to the in-kind firewood policy, which substantially burdens Native American inmate religious exercise. Aside from Linderman's explanation of why an Idaho-style matching-fund account would be unacceptable to ADOC -- testimony which, again, contains foundation problems -- the record is bare of any evidence that ADOC considered feasible, less burdensome alternatives to the in-kind firewood policy.

Sharp complained about the firewood policy numerous times over the course of two years (*see* Exhs. 16_100 – _135) (collecting Sharp's administrative complaints and replies thereto), including offering a specific proposal for a group firewood account (Exh. 16_121). Each complaint was met with an ADOC or CACF statement that essentially reiterated the in-kind firewood policy, but did not discuss ADOC or CACF's rationale for rejecting alternative firewood policies, much less reference alternative policies (*see* Exh. 16_104 ("[T]his response [from ADOC Central Office] will only address the issue of obtaining firewood . . . . The response provided at the unit level is affirmed. The Department is not required by policy to provide supplies for worship ceremonies. Supplies are only available through donations from an outside source.")). *See also* Doc. 71 at 24–25 (May 2013 Order

denying summary judgment as to the RLUIPA claim because relevant Defendants "offered no *evidence*" to support expenses associated with administering group accounts, concluding "[s]pecualtion by defense counsel is also inadequate" to show actual costs) (emphasis in original)). "[I]n light of RLUIPA, no longer can prison officials justify restrictions on religious exercise by simply citing to the need to maintain order and security in a prison." *Greene*, 513 F.3d at 989–90. Because Ryan and Linderman have failed to carry their RLUIPA burden, this Court finds in Sharp's favor as to his RLUIPA claim.

## CONCLUSION

Sharp's Equal Protection Clause claim is denied; his RLUIPA claim is granted. ADOC is directed to establish a group religious account. ADOC may consider adopting one of the five alternatives identified above, or it may adopt its own version of a group religious account. In short, it has flexibility in determining how best to structure and administer the account to allow for inmate and outside monetary contributions for the purchase and delivery of firewood to be used for sweat lodge ceremonies.

IT IS SO ORDERED.

s/ *Jack Zouhary*
JACK ZOUHARY
U. S. DISTRICT JUDGE

July 18, 2014